[S.F. No. 24436. Apr. 25, 1983.]

HARRY R. ROBERTS, a Judge of the Superior Court, Petitioner, v. COMMISSION ON JUDICIAL PERFORMANCE, Respondent.

740

**COUNSEL**

Arne Werchick, Justin A. Roberts and Werchick & Werchick for Petitioner.

George Deukmejian, Attorney General, Robert H. Philibosian, Chief Assistant Attorney General, Arnold O. Overoye, Assistant Attorney General, Gregory W. Baugher and W. Scott Thorpe, Deputy Attorneys General, for Respondent.

OPINION

**THE COURT.**—We issued a writ of review in response to the petition of Harry R. Roberts, Judge of the Mono County Superior Court, which was filed pursuant to rule 919 of the California Rules of Court, requesting that we reject the recommendation of the Commission on Judicial Performance (the commission) that he be publicly censured. Judge Roberts contends that the commission's findings are unsupported by the evidence, and that his conduct does not warrant censure. He also complains of the commission's public disclosure of its censure recommendation prior to our consideration of his petition. We have concluded that the commission's recommendation is fully justified by the record and that petitioner should be publicly censured. We further conclude that the commission's public disclosure of its recommendation was authorized by law under the circumstances in this case.

The commission's findings were based upon the report to it of three special masters, who conducted extensive hearings. The findings concerned eight separate instances of misconduct. Because at least one of those matters (conviction under Pen. Code, § 148 for resisting, delaying or obstructing an officer) involves misconduct which clearly warrants censure, we only briefly summarize the testimony developed before the masters on the other counts.

### 1. The Fish/District Attorney Matter

After petitioner had granted a motion to suppress certain evidence in a criminal case (People v. Fish), Mono County District Attorney C. informed petitioner that he intended to file with the Court of Appeal a petition for mandate to review the ruling. According to C., petitioner became visibly angry, told C. that he was "chicken to take the case to trial," poked C. in the chest with his finger, and told C. "Buddy boy, you're not going to get away with this." Petitioner further stated "I'm going to see that you lose this case big." When C. protested the threat, petitioner replied "I'll threaten you anytime I feel like it."

In his defense, petitioner minimized the confrontation and testified that he was simply concerned about the impact of an anticipated delay upon his court calendar as a result of the writ proceeding. He denied referring to C. as "Buddy boy."

### 2. The Fish/Public Defender Matter

Following his conversation with C., petitioner met with Fish's counsel, Public Defender F., and had several ex parte conversations with him regarding the writ proceedings. During one such conversation, petitioner told the

defender that "You'd better win this or I won't grant another motion for you." The defender testified that he believed that petitioner's statement was serious.

Petitioner admitted that he was engaged in ex parte conversations with the defender, and that the merits of the writ proceeding were discussed. He also admitted making a remark regarding denial of the defender's further motions, but he stated that he was referring only to future similar search motions in the *Fish* case.

### 3. *The Fish/Puglia Matter*

Presiding Justice Robert Puglia of the Third Appellate District participated in the Fish writ proceeding which ultimately resulted in granting the People's petition for mandate. According to Justice Puglia, petitioner became angered at the decision and, before the rehearing time had expired, telephoned Justice Puglia advising him that the appellate decision was wrong, and asking him to "take a look at it and indicated . . . something to the effect that if we didn't change it, there would be a petition for hearing in the Supreme Court."

Petitioner testified that, at the time of this conversation, he assumed that the Court of Appeal opinion was final, and that he called Presiding Justice Puglia simply to inform him that a petition for hearing had been filed and that he had a new theory indicating the Court of Appeal opinion was incorrectly decided.

### 4. *The Jeremy C. Hearing Matter*

In this child neglect proceeding, the commission found that petitioner "improperly acted as an advocate, prejudged issues, abusively curtailed the presentation of evidence, and treated witnesses, litigants and an attorney in a rude, intimidating and demeaning manner." No purpose would be served in describing at length such misconduct; a few examples will suffice. In response to Attorney M.'s objection to petitioner's observation regarding her client's unfitness as a mother, petitioner replied "I don't care whether you object to it or not . . . . I will hear no further objections of this kind, do you understand, Miss [M.]?" After the minor's mother attempted to correct one of petitioner's statements, he admonished her, saying "If you have anything to offer you are going to be sworn. You have no credibility with this court. When you are sworn, let alone volunteer statements, . . . I don't believe a word you have testified to in this courtroom." Petitioner demonstrated similar impatience toward witness C., who supported the mother's fitness as a parent. Interrupting C.'s testimony in mid-sentence, petitioner stated "You may step down. I wouldn't believe you under oath. I don't want any more testimony like this. This witness doesn't know in one breath, and in the next breath it makes no difference. She would

have [the mother], who had abused her own child, babysit hers. Now, I don't have to listen to that kind of evidence."

### 5. *The Jeremy C./Attorney M. Matter*

Following the Jeremy C. hearing, according to Attorney M., petitioner approached her, told her that it would be a "disservice" to her client to appeal his decision, and threatened to report her to the State Bar if she advised her client to appeal. Petitioner denied making this threat, and claimed that he merely advised M. that if she brought a frivolous appeal she might find herself before the State Bar.

### 6. *The Jeremy C./Attorney F. Matter*

After the minor's mother retained Attorney F. in place of M., petitioner engaged F. in an ex parte conversation and asked him to discuss with his client the possibility of dismissing the appeal from petitioner's ruling. Petitioner denied making this request.

### 7. *The Attorney A. Matter*

Attorney F. assigned one of his newer associates, Attorney A., to try a felony case, People v. LaChuga. When she appeared before petitioner, he called a recess and, in unreported proceedings in his chambers, he accused her of being incompetent to represent the defendant, and rudely quizzed her regarding her legal experience. As a result of petitioner's loud and angry manner, Miss A. began to cry and left the conference to summon F.

Petitioner defended his actions on the basis of his earlier experience with A., a complaint filed regarding her competence, and her failure to cross-examine witnesses effectively.

### 8. *The Misdemeanor Conviction*

On February 3, 1981, following a jury trial, petitioner was convicted of violating section 148 of the Penal Code (resisting, delaying or obstructing a public officer). The conviction is now final. Although petitioner objected to the commission's consideration of the underlying facts, we briefly outline those facts based upon evidence which was introduced at the commission hearing. (See also *People* v. *Roberts* (1982) 131 Cal.App.3d Supp. 1 [182 Cal.Rptr. 757].)

On July 18, 1981, uniformed highway patrol officers stopped a car which was being driven erratically by petitioner's son in Marin County. The officers

commenced to administer to the son a field sobriety test. According to the officers' testimony, petitioner exited the car, told the officers that they "had no business stopping" the car, and in a loud voice directed obscenities at the officers. After being told to stop interfering and reenter the car, petitioner repeated his obscene language and advised the officers that they did not know who he was. Eventually, petitioner produced a card identifying himself as a judge and handed it to the officers, stating that he would not reenter the car, that the officers had no right to examine his son, and that he was going to watch everything that the officers did.

The officers continued to urge petitioner to return to the car, but he refused; petitioner's obscenities made it difficult for them to conduct their tests. After being threatened with arrest, petitioner walked quickly toward Officer Rogers, told him that "he [petitioner] was sick and tired of me [the officer] telling him what to do," and demanded his name and badge number. Petitioner stood next to the officer and struck him in the chest, grabbing the officer's shirt. The officer thereupon declared petitioner under arrest, but petitioner continued to struggle and eventually pulled the officer to the ground.

Petitioner, his son and daughter-in-law each denied that petitioner sought preferential treatment, and they blamed the officers' rude and discourteous conduct for escalating the confrontation. Petitioner denied that he struck Officer Rogers.

The commission found that petitioner's conduct with respect to each of the eight matters summarized above constituted either wilful misconduct in office or conduct prejudicial to the administration of justice which brings the judicial office into disrepute. (See Cal. Const., art. VI, § 18, subd. (c).) In addition, the commission found that petitioner's conduct in the Puglia matter (pt. 3, *ante*) violated both section 68070.5, subdivision (b), of the Government Code (forbidding communications between the judge hearing an original writ matter and the judge named as party respondent), and canon 3(A)(4) of the Code of Judicial Conduct (forbidding ex parte communications concerning pending matters).

By a vote of six to one, the commission recommended that petitioner be publicly censured. The dissenting commissioner favored petitioner's removal from office.

■ In reviewing the commission's findings and conclusions, we undertake an independent examination of the record to determine which, if any, of the charges are supported by clear and convincing evidence. (*Wenger* v. *Commission on Judicial Performance* (1981) 29 Cal.3d 615, 622 [175 Cal.Rptr. 420, 630 P.2d 954].) We give weight to the findings and conclusions of the commis-

sion and its masters, especially as to factual issues turning on the credibility of testimony. (*Id.*, at pp. 622-623.)

Petitioner, refusing to acknowledge any misconduct deserving of censure, reargues the evidence supporting the commission's various findings and accuses the commission of "focusing on triviality" and exceeding its jurisdiction.

 With respect to petitioner's apparent personal involvement with the *Fish* writ proceedings, petitioner argues that: (1) his discussion with the district attorney was "trivial in nature" and motivated by a legitimate concern over petitioner's court calendar; (2) his conversation with the public defender was permitted under rule 56(b) of the Rules of Court (authorizing the respondent "court" to join the real party in opposing the writ); and (3) his telephone conversation with Justice Puglia was made at a time when petitioner assumed the Court of Appeal had lost its jurisdiction over the *Fish* matter. Petitioner also argues that the commission failed to include the Puglia conversation among those counts of misconduct originally included in the notice of formal proceedings. Instead, the count was added by the special masters in an amended notice, pursuant to rule 911 of the Rules of Court.

 Petitioner's course of conduct with respect to the *Fish* writ proceeding demonstrates an impermissible personal involvement in the litigation, accompanied by overly aggressive or threatening behavior toward both the district attorney and the public defender, and an inexcusable ex parte communication with Justice Puglia (see Gov. Code, § 68070.5, subd. (b)). Petitioner's attempt to exert pressure upon prosecutor, defense counsel and appellate court alike discloses an unhealthy and wholly improper concern with the protection of his own rulings from appellate reversal.

 We reject petitioner's contention that rule 56(b) authorizes a trial judge to participate personally in ex parte communications with the real party regarding subsequent writ proceedings seeking review of the judge's order. Although the trial *court* becomes a party respondent to the proceeding, the court is usually represented (if at all) by its county counsel. (See *Elysium, Inc.* v. *Superior Court* (1968) 266 Cal.App.2d 763 [72 Cal.Rptr. 355].) The individual judge of the court whose order is being reviewed is not a proper party to the proceeding. (See *Matter of De Lucca* (1905) 146 Cal. 110, 113 [79 P. 853]; *Lawson* v. *Superior Court* (1957) 155 Cal.App.2d 755, 761 [318 P.2d 812]; *Neblett* v. *Superior Court* (1948) 86 Cal.App.2d 64, 66 [194 P.2d 22].)

 We further reject petitioner's assertion that the commission was foreclosed from relying upon his telephone conversation with Justice Puglia by reason of its failure either to include that charge in the original notice of proceedings, or to amend that notice. Rule 911 of the Rules of Court authorizes the

commission *or* the masters, at any time prior to the conclusion of the hearing, to amend the notice to conform to proof *or set forth additional facts,* so long as the judge is given a reasonable time to respond and defend against the amended charges. We see no constitutional deficiency in this procedure. (See *McCartney* v. *Commission on Judicial Qualifications* (1974) 12 Cal.3d 512, 519 [116 Cal.Rptr. 260, 526 P.2d 268].) Petitioner had an ample opportunity to rebut the amended charges.

■ We conclude that petitioner's conduct with respect to the *Fish* writ proceeding constituted "conduct prejudicial to the administration of justice that brings the judicial office into disrepute." (Cal. Const., art. VI, § 18, subd. (c).) As explained in prior cases, the foregoing constitutional provision "do[es] not require notoriety, but only that the conduct be 'damaging to the esteem for the judiciary held by members of the public who observed such conduct.' [Citation.]" (*Wenger* v. *Commission on Judicial Performance, supra,* 29 Cal.3d at pp. 622-623, fn. 4.)

■ Although the commission's censure recommendation could be sustained on the basis of the foregoing conduct alone, we review petitioner's contentions with respect to the remaining charges. As indicated above, petitioner's treatment of witnesses, litigants and counsel in the *Jeremy C.* matter was found to be rude and intimidating. In addition, petitioner threatened to report Attorney M. to the State Bar if she advised her client to appeal petitioner's adverse ruling. Finally, petitioner asked Attorney F. to discuss with his client the possibility of dismissing that appeal.

Petitioner attempts to excuse his abusive conduct at the child neglect hearing on the ground of his serious concern for the welfare of the minor and his firm conviction regarding the lack of credibility shown by the mother and her witnesses. The fact remains, however, that petitioner expressed his legitimate concern in an unacceptable, nonobjective and nonneutral manner, demonstrating unwarranted impatience, disbelief and hostility toward counsel, litigant and witnesses. Such conduct constitutes conduct prejudicial to the administration of justice, casting the judicial office into disrepute, and warranting our censure. (Cf. *McCartney* v. *Commission on Judicial Qualifications, supra,* 12 Cal.3d at pp. 530, 533-535.) As we stated in *McCartney,* "A trial judge may *not* . . . in the course of examining witnesses become an advocate for either party or cast aspersions or ridicule upon a witness. [Citations.]" (P. 533, italics in original.)

As for petitioner's threat to report Attorney M. to the State Bar for advising her client to appeal, and his request to successor Attorney F. to discuss with the client the possibility of dismissing that appeal, such conduct reflects the same improper personal involvement and advocacy exhibited by petitioner in the Fish

matter. Although petitioner denied both the threat and the request, the commission's contrary findings are supported by the clear and convincing testimony of both Attorneys M. and F.

■ With respect to petitioner's treatment of Attorney A. in People v. LaChuga, the record reflects petitioner's good faith concern regarding the attorney's ability competently to litigate a felony case, and his surprise that Attorney F. had delegated the matter to A. Yet the record also indicates that petitioner's interrogation of her was handled in a callous and abusive manner. Petitioner offers no excuse for such conduct, merely observing that "Respondent made no critical or derogatory remarks *in open court* concerning Ms. [A.]." (Italics added.) As indicated above, the proceedings took place in chambers and were unreported (despite the presence and availability of a court reporter). Although petitioner's treatment of Attorney A., standing alone, might not warrant censure, nevertheless in the light of the entire record such conduct once again reflects a censurable impatience or hostility in his professional relationship with others, as previously discussed.

■ Finally, petitioner's misdemeanor conviction affords an entirely independent and self-sufficient basis for sustaining the commission's censure recommendation. As previously noted, petitioner was convicted of violating Penal Code section 148 (resisting, delaying or obstructing a public officer). While admitting the conviction, petitioner objects to the consideration, by either the commission or this court, of the factual circumstances underlying the offense. According to petitioner, the commission's notice of proceedings "merely" alleged the fact of his conviction, and he subsequently stipulated to that conviction. Thereafter, at the evidentiary hearing before the special masters and citing his stipulation, petitioner objected to the admission of evidence regarding the offense. Accordingly, he asserts, the introduction of such evidence supposedly was limited to support the allegations of a *dismissed* count (improper attempt to use judicial office). Thus, petitioner argues, "the only question that can and must be answered by this Court is whether mere proof of a misdemeanor conviction, standing alone, can be the basis for judicial discipline by this Court." (Fn. omitted.)

The record shows, however, that at the conclusion of the hearing, one of the masters announced that although the underlying evidence relating to the misdemeanor conviction was elicited primarily with respect to the abuse-of-office count, it was also received, *and would be considered,* in connection with the conviction count. Petitioner made no objection at that time to the masters' dual use of the evidence. Once the unfavorable report was filed, however, petitioner thereupon urged that the commission's own decision should be confined to the face of the stipulated conviction, without consideration of any of the underlying facts.

Although we have found no authorities which discuss the issue, we have concluded it is entirely appropriate for the commission or its masters to examine the facts and circumstances underlying a misdemeanor conviction in determining whether the offense calls for discipline. Of course, the commission or masters in their discretion may limit the scope of such inquiry and thereby avoid a needless retrial of the criminal charges. But a judge may not be permitted to prevent the commission's review of the underlying facts merely by stipulating that a judgment of conviction had been entered. In the present case, therefore, petitioner's objection to the admission of evidence regarding his conviction should have been, and was, overruled. (As indicated above, petitioner failed to renew that objection when the masters announced their intent to rely upon such evidence in relation to *both* the conviction count and the abuse-of-office count.)

Petitioner suggests that he relied upon the masters' original ruling dealing with the fact of a conviction and failed to present additional exonerating testimony bearing upon the conviction count. He fails to specify, however, what additional evidence he would have submitted in this regard. In any event, it is uncontradicted that petitioner was convicted of resisting, delaying or obstructing public officers in the course of their investigation of a possible intoxicated driving offense by his son. That conviction is now final and affords an additional sound basis for censuring petitioner, even without considering the surrounding circumstances. We reject as frivolous his counsel's assertion that a "mere" offense of this kind is akin to such other misdemeanor offenses as fishing without a license or playing unauthorized bingo games.

■ Petitioner's final contention challenges the apparent practice of the commission in making public its disciplinary recommendation when it is submitted to this court. Petitioner asserts that the release of advance publicity of this kind amounts to prejudgment of his case and a public censure improperly imposed before we have sanctioned such discipline.

The commission responds that the applicable rules appear to authorize such disclosure. Rule 902(a) of the Rules of Court states that "Except as provided in this rule, all papers filed with and proceedings before the Commission, or before the masters, . . . shall be confidential *until a record is filed by the Commission in the Supreme Court.*" (Italics added; see also rule 902(b), permitting the commission to issue "short announcements" concerning the hearing under limited circumstances.) Apparently, the record was filed with us simultaneously with the commission's public announcement. Moreover, the confidentiality requirement of article VI, section 18, subdivision (f), of the state Constitution would "not preclude either the Commission or a judge under investigation from publicly announcing the results of an investigation already known to the public." (*Mosk* v. *Superior Court* (1979) 25 Cal.3d 474, 502 [159 Cal.Rptr.

494, 601 P.2d 1030].) Petitioner acknowledges that the proceeding herein was publicly reported prior to the filing of the commission's findings and recommendation. We conclude that the commission properly followed the applicable rules, and that any changes in those rules should be initiated by the Judicial Council, not this court. In any event, any impropriety by the commission in this regard would neither excuse petitioner's misconduct nor require dismissal of the proceedings against him.

Our review of the record persuades us that the commission's recommendation of censure is fully warranted and should be adopted. Accordingly, and by this order, Judge Roberts is hereby publicly censured.

**MOSK, J.**—I dissent.

I do not propose to discuss the merits of the public censure of Judge Roberts ordered by the court in this case. It is my view that the action of my colleagues is redundant: in effect the judge has already been publicly censured by the Commission on Judicial Performance. In so doing, however, the commission has improperly assumed a function which the Constitution authorizes only this court to perform.

Article VI, section 18, subdivision (c), carefully delineates the responsibilities of the commission and the Supreme Court. Only the court may retire, censure or remove a judge. The commission, by contrast, is limited to the power to *"privately* admonish a judge found to have engaged in an improper action or a dereliction of duty" (italics added), and even that is subject to court review.

In this instance the commission made a public release of its recommendation for reproval. Once reported to the world, the commission action was not the private admonishment which the Constitution and rule 920(a) of the Rules of Court authorize, but itself became a public reproval which only the court may properly administer.

The commission apparently bases its justification for this invasion of the court's prerogative on rule 902. If rule 902 can be read to permit press releases by the commission, then it clearly violates article VI, section 18, subdivision (f), of the Constitution, which authorizes only rules "providing for confidentiality," not rules to evade confidentiality.

However, I do not read rule 902 to justify the public notoriety that the commission seems to seek. Rule 902(a) requires that all papers and proceedings of the commission "shall be confidential." Rule 902(b) provides in subsection (1) that a public statement may be made "at the request of the judge

involved"; in (2), a statement may be made "if there is no basis for further proceedings or recommendation of discipline"; in (3), when the administration of justice is threatened a statement may be made confirming the fact of a hearing and describing the "procedural aspects"; in (4), when a judge resigns a statement may be made "to a public entity"; and in (5), after investigation the commission may make certain disclosures "to the person complaining against the judge."

Nothing in rule 902 permits the commission, under the circumstances of this case, to violate the confidentiality which was always intended to be the hallmark of these proceedings. As stated above, if the commission persists in misinterpreting the rule to allow it to go public by announcing a recommendation of discipline then I would declare the rule invalid.

The majority refer to an unfortunate dictum in *Mosk* v. *Superior Court* (1977) 25 Cal.3d 474, 502 [159 Cal.Rptr. 494, 601 P.2d 1030], that arguably permits the commission to announce "the results of an investigation already known to the public." The dictum is inconsistent with the body of the opinion in that case, which discussed at considerable length the history and bases of the confidentiality concept and the public policy in support thereof. (*Id.*, pp. 488-499.) Any conflict between the text and rationale of an opinion and an incidental dictum therein must, of course, be resolved in favor of the former. In any event, there was no actual discipline ordered in that case, then or subsequently; the issue involved the required confidentiality of a mere preliminary investigation which the commission unconstitutionally sought to undertake in a circus atmosphere not only open to the public but replete with radio and television coverage.

It might be argued that even if the commission met its responsibility of confidentiality, the recommendation for discipline would become known when it was filed with this court. That is not necessarily so. The material filed with the court does not identify the judge involved; in this instance the case was entitled "Inquiry Concerning a Judge No. 49." Only when the judge files a petition for writ of review, seeking a hearing in open court, does his identity become general knowledge. Thus, going public remains the choice of the judge, not of the commission.

In the event a judge does not seek a writ of review, this court determines on the basis of the commission record and recommendation the nature of the discipline, if any, to impose. The court is not required to adopt the commission recommendation. Under some circumstances the court may see fit to administer mere private censure by minute order, using the anonymous case title. But if the commission has previously made the matter public, private censure becomes an impossibility. I insist the commission has no right to so restrict the options available to this court.

In the instant matter, the release of the commission's conclusion tarred Judge Roberts with a broad brush. Before the matter was argued in court, the public was informed that he should be censured. Thus the actual order by this court is not only anticlimactic, it doubles the reflection on the judge's judicial performance in the eyes of his constituents. Not even the most heinous conduct merits infliction of the same discipline twice. Excessive punishment is not the path to rectitude.

In view of the action by the commission, and to discourage its repetition in future cases, I would dismiss these proceedings.